# EXHIBIT "A"

PACIFIC JUSTICE
INSTITUTE

SACRAMENTO, CA   SALEM, OR   SAN JOSE, CA   SANTA ANA, CA   SEATTLE, WA

January 10, 2019

**SENT VIA REGULAR MAIL AND E-MAIL**
Mark Bartholomew
City Attorney
City of Grants Pass
101 Northwest A St.
Grants Pass, OR 97304
mbartholomew@grantspassoregon.gov

Re: **Abolish Abortion Oregon**
**Use of Sound-Amplifying Equipment at Farmers' Market**
**Violation of First Amendment Rights**

Dear Mr. Bartholomew:

The Pacific Justice Institute ("PJI") is a non-profit law firm whose mission includes defending religious liberty and related First Amendment-protected freedoms, including and especially the freedom of speech. Please be advised that Abolish Abortion Oregon ("AAO") has asked PJI to draft this letter of opinion addressing whether members of the organization have the right to use sound-amplifying equipment to share their message at public events in Grants Pass.

**I. Facts**
AAO is an unincorporated organization comprised of Christians dedicated to calling the public's attention to the horrors of abortion and calling on legislators to not only abolish the practice, but criminalize it. On the morning of Saturday, October 17, 2018, several AAO members traveled from Douglas County to Grants Pass to share their message at the weekly farmers' market at 4th and F streets. After arriving, four AAO members stood on street corners holding signs featuring aborted babies while two others, Mason Goodknight and Mark Mayberry, took turns preaching anti-abortion and Christian gospel messages from blocked-off portions of the street, which essentially served as extensions of nearby sidewalks. When taking their respective turns to preach, Mr. Goodknight and Mr. Mayberry wore a headset with a microphone attached to a small amplifier that fit inside a fanny pack. Mr. Goodknight and Mr. Mayberry used the amplifier in part because they had to compete with ambient noise – specifically, loud music and cars passing by on the street. The amplifier's volume was at around 50 percent – loud enough for people attending the farmers' market to hear the preachers' message, but not so loud that it could be heard more than roughly half a block away.

At some point while Mr. Goodknight was preaching, merchants complained to the Grants Pass police that his preaching was too loud and that it was interfering with their ability to conduct business. Mr. Goodknight believes that "being too loud" was actually an excuse

1

for people uncomfortable with the content of Mr. Goodknight's message to silence him. Regardless, two Grants Pass police officers, Will Taylor and Jonah Kopp, accosted Mr. Goodknight soon after and told him that it was against local law for him to use an amplifier to preach his message. Not wanting to cause further problems, Mr. Goodknight complied with the officers' demand that he turn off his amplifier. Mr. Goodknight continued to preach after the officers left the scene, but though he has a loud, booming voice, Mr. Goodknight was able to reach far fewer listeners than he would have had he been able to use his amplifier.

## II. Legal Analysis

The U.S. Constitution's First Amendment protects individuals' freedom of speech as well as their free exercise of their religious beliefs. U.S. Const. amend. I. The First Amendment has been made applicable to state and local governments through the Fourteenth Amendment's Due Process Clause. *Menotti v. City of Seattle*, 409 F.3d 1113, 1140 n. 51 (9th Cir. 2005). Furthermore, the Oregon Constitution "prohibits state actors from 'restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever.'" *Eagle Point Educ. Assn./SOBC/OEA v. Jackson City Sch. Dist. No. 9*, 880 F.3d 1097, 1108 (9th Cir. 2018) [quoting Or. Const. art. I, § 8].

### A. Mr. Goodknight and His Fellow Abolitionists Conducted Their Speech-Related Activities in a Traditional Public Forum.

The U.S. Supreme Court "has adopted a forum analysis to determine when 'the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" *Bench Billboard Co. v. City of Toledo*, 690 F. Supp. 2d 651, 662 (N.D. Ohio 2010) [quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)]. The Supreme Court recognizes the existence of several different types of forums, including traditional public forums, designated public forums, and non-public forums. *Id.* [quoting *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45-46 (1983)].

For purposes of this discussion, it is unnecessary to explain in detail the differences between the different types of forums; what matters is that **"[s]treets, sidewalks, and parks[ ] are** considered, without more, to be 'public forums.'" *U.S. v. Kokinda*, 497 U.S. 720, 742 (1990) (Brennan, J., dissenting) (emphasis added) [quoting *U.S. v. Grace*, 461 U.S. 171, 177 (1983)]. As public sidewalks are "a prototypical example of a traditional public forum," speech on public sidewalks **receives the utmost protection under the First Amendment**. *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377 (1997) (emphasis added); *see also Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) [quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)]. AAO was thus freer to conduct its anti-abortion activities on the streets and sidewalks near the farmers' market than perhaps any other location in Grants Pass.

Although cities have "a strong interest in ensuring public safety and order ... on public streets and sidewalks," that interest alone is insufficient to validate a content-based regulation of speech in a traditional public forum. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994). A city must show that the regulated communicative activity endangers the city's

interest in ensuring order. *Kuba v. 1-A Agric. Assn.*, 387 F.3d 850, 859 (9th Cir. 2004); *see also Edwards v. City of Santa Barbara*, 883 F. Supp. 1379, 1392-93 (9th Cir. 1995) (hereinafter *Edwards*) [noting that the "captive audience doctrine," which permits governments to prohibit objectionable speech where a "captive" audience cannot avoid it, "has been applied only sparingly in public fora"]. A city's police officers cannot suppress speech "*simply because its exercise may be 'annoying' to some people*." *Coates v. City of Cincinnati*, 402 U.S. 611, 615-16 (1971) (emphasis added).

It is unclear whether Officers Taylor and Kopp sought to silence AAO – and Mr. Goodknight in particular – due to animus toward anti-abortion activists, Christians, or religion in general. Even assuming *arguendo* that they simply aimed to enforce the law, government actors – Officers Taylor and Kopp included – may not "may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990). Where a state actor (1) engages in conduct that "would chill or silence a person of 'ordinary firmness' from future First Amendment activities," and (2) "such deterrence was a substantial motivating factor in the [actor's] conduct," the actor violates the First Amendment. *Watson v. City of Vancouver*, 2015 U.S. Dist. LEXIS 31400 at **26-27 (W.D. Wash. 2015). That is what happened here: A person of ordinary firmness is likely to cease First Amendment-protected activities at a given location, and less likely to return to that location to engage in First Amendment-protected activities there, if the person knows there will likely be trouble with the police. In claiming that Mr. Goodknight's use of an amplifier was against the law and demanding that he turn it off accordingly, Officers Taylor and Kopp meant to intimidate him and his fellow AAO members into ceasing their First Amendment-protected speech activities at the farmers' market, thereby violating AAO's First Amendment rights.

### B. Silencing Mr. Goodknight and His Fellow Abolitionists Was Not a Constitutionally Permissible "Time, Place, and Manner" Regulation.

In its defense, the City of Grants Pass (the "City") would presumably assert that its actions in telling Mr. Goodknight to turn off his amplifier were nothing more than the type of "time, place, and manner" regulation that is allowable even in a traditional public forum under *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). To pass constitutional muster, a "time, place, and manner" restriction must (1) be justified without reference to the content of the regulated speech, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for the communication of information. *Ward*, 491 U.S. at 791. The City's actions fail to meet the "narrow tailoring" prong in multiple ways: For one thing, even assuming *arguendo* that the City has a significant interest in ensuring that merchants at the farmers' market can communicate effectively enough with their customers to conduct business, the City cannot show that this interest "could not be achieved less effectively without regulation." *Ward*, 491 U.S. at 799 [quoting *U.S. v. Albertini*, 472 U.S. 675, 689 (1985)]. Indeed, while Mr. Goodknight was preaching, purchasers still communicated what they wanted to buy, merchants still told them how much they owed, and money and goods still changed hands. In other words, transactions would still have occurred whether or not the police stopped Mr. Goodknight from preaching, meaning regulation was entirely unnecessary. Furthermore, any "time, place, and manner" regulation of speech must not be substantially broader than

3

necessary to achieve the interest the government seeks to promote. *Ward*. 491 U.S. at 800. In this case, the officers' demand that Mr. Goodknight shut off his amplifier was substantially broader than necessary – and was, in fact, unnecessary – because, as stated above, business was still freely conducted at the farmers' market without the regulation.

### C. Grants Pass' "Unnecessary Noise" Ordinance is Unconstitutional for Vagueness and Overbreadth and is a Content- and Speaker-Based Restriction.

Titled "Unnecessary Noise," Grants Pass Mun. Code § 5.12.110(A) reads as follows (emphasis added):

> "No person may make, assist in making, continue or cause to be making any **loud, disturbing,** or unnecessary noise which either annoys, disturbs, injures or endangers the **comfort**, repose, health, safety **or peace of others**."

Subsection (B)(11) (collectively with Mun. Code § 5.12.110(A) the "Ordinance") prohibits "[t]he use or operation of … any sound-amplifying device so loudly as to disturb persons in the vicinity thereof or in such a manner as renders the use thereof a nuisance." The Ordinance further states that the only way an individual can use an amplifier is upon obtaining a permit from the City, and then only for "the broadcast or amplification of music, news, speeches, or general entertainment, as part of a national, state, or City event, public festivals or outstanding events of a noncommercial nature." For the reasons stated below, the Ordinance is unconstitutional on its face:

■ **Vagueness:** "The prohibition against vague criminal statutes serves the dual purposes of 'providing notice, with a reasonable degree of certainty, of the conduct that is prohibited' and 'preventing a judge, jury, **or other law enforcer from exercising uncontrolled discretion in punishing defendants**.'" *State v. Schwartz*, 173 Or. App. 301, 309-10 (2001) [quoting *State v. Chakerian*, 325 Ore. 370, 382 (1997)]. An ordinance "is void for vagueness if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if ***it invites arbitrary and discriminatory enforcement***." *U.S. v. Adams*, 343 F.3d 1024, 1035 (9th Cir. 2003) (emphasis added). An ordinance invites arbitrary and discriminatory enforcement if <u>**it lacks specific standards or guidelines**</u>, thereby allowing police officers to "pursue their personal predilections" when enforcing the ordinance. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (emphasis added); *see also Bd. of Airport Commrs. v. Jews for Jesus*, 482 U.S. 569, 576 (1987) [quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135-36 (1974), which states that a law which "confers on police a virtually unrestrained power to … charge persons with a violation" of the law is unconstitutional because "the opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident"]. "The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to ***inhibit the exercise of individual freedoms affirmatively protected by the Constitution***." *Cramp v. Bd. of Public Instruction*, 368 U.S. 278, 287 (1961) (emphasis added).

In this case, the Ordinance is vague for several reasons. To begin with, the Ordinance does not define what constitutes a "loud" or "disturbing" noise. What is "loud" depends on the hearer:

4

What is loud to one person, even when broadcast at a volume that most would consider reasonable, may not be loud enough for someone else to hear. This is especially true when the speaker has to compete with ambient noise such as loud music or passing cars. The word "disturbing" is likewise subjective: When someone speaks openly about controversial topics such as abortion, as AAO's preachers did, there is unquestionably potential for someone who disagrees with the views expressed, or even who simply finds the subject unpleasant, to find the noise disturbing. The Ordinance thus lacks specific standards or guidelines to guide the City's police officers in determining what is "loud" or "disturbing," thereby inviting arbitrary and discriminatory enforcement: All a police officer has to do is decide for himself – as Officers Taylor and Kopp did here – that sounds produced by sound-amplifying equipment are loud and/or disturbing, or be told that the sounds are bothering someone, and they have grounds to silence the speaker.

The Ordinance is like that at issue in *Saia v. New York*, 334 U.S. 558 (1948), in which the U.S. Supreme Court struck down a law forbidding the use of sound amplification devices except with the permission of the local chief of police. The law in *Saia* was not "narrowly drawn to regulate … the volume of sound (the decibels) to which they must be adjusted." *Id.* at 560. The same is true here: The Ordinance makes no reference to any decibel level at all. Such a reference would provide an objective, measurable standard by which a police officer can judge whether a speaker is broadcasting his speech too loudly. Here, Officers Taylor and Kopp were told that Mr. Goodknight's speech was bothering people and told him to turn off his amplifier accordingly. That is precisely the sort of arbitrary and discriminatory enforcement that the Ordinance invites due to its lack of specific standards or guidelines. The Ordinance is thus unconstitutionally vague.

■ **Overbreadth:** "If a law is aimed not at the content of speech but at specific harms or proscribed effects that could be caused by speech, its constitutionality is tested by the breadth of the law or particulars of its application." *State v. Moyer*, 225 Or. App. 81, 102 (2009). "[W]hen overly broad statutory language seems to sweep protected First Amendment expression directly into the scope of a regulation affecting speech, *or indirectly places an undue burden on such protected activity*, free expression can be chilled[.]" *Powell's Books, Inc. v. Myers*, 599 F. Supp. 2d 1226, 1237 (D. Or. 2008) (emphasis added) [quoting *American Booksellers Assn. v. Webb*, 919 F.2d 1493, 1499 (11th Cir. 1990)], rev'd on other grounds, *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202 (9th Cir. 2010). An ordinance which infringes on more traditionally favored expressive activity in traditional public fora than is necessary to achieve the government's purposes is overbroad, and therefore unconstitutional, under the First Amendment. *Edwards*, 883 F. Supp. at 1392-93.

Furthermore, Article I, § 8 of the Oregon Constitution states, "*No law shall be passed restraining the free expression of opinion, or restricting the right to speak*, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right" (emphasis added). Cities may regulate amplified noise, an effect of speech, without violating Article I, § 8. *City of Portland v. Ayers*, 93 Or. App. 731, 735 (1988). However, laws regulating amplified noise violate Article I, § 8 when they are overbroad. *See*, e.g., *City of Eugene v. Lee*, 177 Or. App. 492, 501 (2001) [citing *City of Eugene v. Powlowski*, 116 Or. App. 186 (1992) (striking down an ordinance that "prohibited making 'any unnecessary or

unreasonably loud or harsh sound by means of a horn' except as a 'reasonable warning'" as overbroad in violation of Article I, § 8)].

In *State v. Robertson*, 293 Or. 402 (1982), the Oregon Supreme Court established a framework for analyzing challenges to laws that purportedly infringe on free expression in violation of Article I, § 8. *Moyer*, 348 Or. at 228-29 [citing *State v. Plowman*, 314 Or. 157, 163-64 (1992) (quoting *Robertson*, 293 Or. at 412)]. Under *Robertson*, laws concerning speech or expression are divided into three categories:

> The first *Robertson* category consists of laws that focus on the content of speech or writing or are written in terms directed to the substance of any opinion or any subject of communication. Laws within that category violate Or. Const. art. I, § 8, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 [the year of Oregon's admission to the Union] demonstrably were not intended to reach. The second *Robertson* category consists of laws that focus on forbidden effects, but expressly prohibit expression used to achieve those effects. Laws in that category are analyzed for overbreadth. Finally, the third *Robertson* category consists of laws that focus on forbidden effects, but without referring to expression at all. Laws within the third category are analyzed to determine whether they violate Or. Const. art. I, § 8 as applied.

*State v. Carr*, 215 Or. App. 306, 311 (2007) [quoting *City of Eugene v. Miller*, 318 Or. App. 480, 488 (1994) (citing *Robertson*, 293 Or. at 417)].

In this case, the Ordinance falls into the second *Robertson* category, as the Ordinance focuses not on the substance of any opinion or subject of communication, but on a forbidden result – namely, the broadcasting of speech in a manner that is loud and disturbing and endangers the comfort or peace of others. Mun. Code § 5.12.110(A). The Ordinance is unconstitutionally overbroad because it sweeps constitutionally protected speech within its scope: Given that abortion is a highly controversial topic, it is virtually certain that someone – perhaps multiple people – attending the farmers' market found their comfort and peace disturbed by Mr. Goodknight's preaching. However, the First Amendment exists precisely to protect speech such as that of AAO's members: Mr. Goodknight's anti-abortion preaching, especially when accompanied by fellow activists holding signs featuring gruesome pictures of slaughtered unborn babies, was intended to shock people's consciences, which would disrupt anyone's comfort or peace. Still, the Supreme Court has held that a city's interest in ensuring the comfort and peace of its citizens is not enough to justify infringement on the constitutionally protected freedom of speech. *See, e.g., Cantwell v. Connecticut*, 310 U.S. 296 (1940) [protecting the right of Jehovah's Witnesses to play an anti-Catholic record on the street in a largely Catholic neighborhood]. The First Amendment exists precisely to protect unpopular speech. Webber v. First Student, Inc., 2011 U.S. Dist. LEXIS 88238 at **9-10 (D. Or. July 12, 2011).

6

- **Speaker-based restriction:** "Speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1076-77 (9th Cir. 2006) [quoting *Turner*, 512 U.S. at 568].

In this case, the Ordinance only allows the use of sound-amplifying equipment "for the broadcast or amplification of music, news, speeches, or general entertainment *as a part of a national, state, or City event, public festivals or outstanding events* of a noncommercial nature," and then only after the organizer of the relevant event obtains a permit. Mun. Code § 5.12.110(B)(11) (emphasis added). In other words, the Ordinance shows a preference for "responsible persons and organizations" that are hosting organized events and are willing and able to pay the permit fee. The Ordinance forecloses groups like AAO from using sound-amplifying equipment to ensure that their message, which they strongly feel needs to be heard, actually is heard. Furthermore, the Ordinance, as worded, strongly implies that the City will only issue permits for feel-good, celebratory events. Perhaps the City would issue a permit for an organized anti-abortion demonstration, but neither the First Amendment nor Article I, § 8 of the Oregon Constitution require that AAI organize an event to be able to speak their minds or be heard. The Ordinance is therefore an unconstitutional speaker-based restriction.

- **Content-based restriction:** As stated above, the Ordinance only allows the use of sound-amplifying equipment "for the broadcast or amplification of *music, news, speeches, or general entertainment* as a part of a national, state, or City event, public festivals or outstanding events of a noncommercial nature," and then only after the organizer of the relevant event obtains a permit. Mun. Code § 5.12.110(B)(11) (emphasis added). The preaching done by AAO's street preachers likely falls into the category of "speeches." Nonetheless, the Ordinance prescribes certain types of content – news, music, general entertainment – that can be amplified via sound-amplifying equipment. Even the City's use of the word "speeches" suggests that the speeches given must be formal, as opposed to the off-the-cuff street preaching that AAO's preachers engaged in.

The Ordinance also states the context in which the amplification may occur – i.e., as part of an organized event, such as a festival. If the City only permits the amplification of speech such as AAO's if it takes place within the context of an organized event, then their speech is no longer free. *Sabelko v. City of Phoenix*, 846 F. Supp. 810, 816 (D. Ariz. 1994) [citing *City of Houston v. Hill*, 482 U.S. 451 (1987) to note that "oral protest rests at the very heart of free speech"]. The Ordinance thus restricts speech in a manner that is not constitutionally permissible, and Officers Taylor and Kopp violated AAO's free speech rights by enforcing it, thereby placing the City in a very actionable position.

### III. Demand

"First Amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, *not censorship, enforced silence or eviction from legitimately occupied public space.*" *Gathright v. City of Portland*, 439 F.3d 573, 578 (9th Cir. 2006) (emphasis added), cert. denied, 549 U.S. 815 (2006). Here, AAO's abolitionists were the victims of enforced silence at the hands of Grants Pass' police department. PJI thus demands that Grants Pass' police officers immediately cease and desist attempting to

prevent AAO from engaging in speech-related activities on the streets and sidewalks near the farmers' market – or any other location in Grants Pass, for that matter – from this point forward. Such activities include using an amplifier to ensure that the group's speech is heard; while the City of Grants Pass may regulate the volume at which AAO's message is preached, the City cannot prohibit the organization's use of an amplifier entirely. Please note that any future violations of AAO's First Amendment rights, even if done under the color of enforcing Grants Pass Mun. Code § 5.12.110(B)(11), will be met with swift legal action.

I would also strongly recommend that the City amend the Ordinance so that it meets First Amendment standards of constitutionality.

Thank you kindly for your time and attention to this matter. Please feel free to contact me at either (916) 857-6900 or rhacke@pji.org if you wish to discuss this matter further.

Very truly yours,

*[signature: Ray D. Hacke]*

Ray D. Hacke, Staff Attorney
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE
Salem, OR 95110
(503) 917-4409
rhacke@pji.org


CC: Bill Landis
   Chief
   Department of Public Safety
   101 Northwest A St.
   Grants Pass, OR 97526
   blandis@grantspassoregon.gov