Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE, Suite 33
Salem, OR 97305
(503) 917-4409 Phone
(916) 857-6902   Facsimile

Attorneys for Plaintiffs
ABOLISH ABORTION OREGON et al.


# UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| ABOLISH ABORTION OREGON, An Unincorporated Association; MASON GOODKNIGHT, An Individual; SHAWN KELLIM, An Individual; RYAN CLARK, An Individual; MARK MAYBERRY, An Individual; LORI MAYBERRY, An Individual; ROBBY MAYBERRY, An Individual; and RICKY MAYBERRY, An Individual, | Case No.: 1:20-CV-00484-CL **PLAINTIFFS' REPLY TO RESPONSE OF DEFENDANT CITY OF GRANTS PASS TO MOTION FOR PARTIAL SUMMARY JUDGMENT, AND TO OREGON ATTORNEY GENERAL ELLEN ROSENBLUM'S AMICUS CURIAE BRIEF** |
| Plaintiffs, | |
| v. | |
| CITY OF GRANTS PASS, A Municipality; JAMES HAMILTON, An Individual; TIMOTHY ARTOFF, An Individual; JASON McGINNIS, An Individual; and DOES 1 THROUGH 50, Inclusive, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

SUMMARY OF THE ARGUMENT ......................................................1

ARGUMENT ........................................................................................4

I. The Sound Ordinance and ORS 166.025(1)(b) Are Both Unconstitutionally Vague and Overbroad Because Neither Has the Specificity Required of Criminal Statutes That Abut First Amendment Freedoms .............................5

   A. The State is Incorret in Asserting That ORS 166.025(1)(b) Need Not Define "Unreasonable" .............................................................7

   B. The City's Argument Concerning the Fourth Amendment's Use of the Word "Unreasonable" is Misplaced ......................................10

   C. The City's Reliance on *Costello v. City of Burlington* and *State v. Pucket* is Also Misplaced ..................................................12

   D. There Exists a Substantial Risk That DPS Officers May Use "Unreasonable Noise" or "Disorderly Conduct" as a Pretext to Shut Down AAOR's Constitutionally Protected Speech ................................13

II. Both the City's and the State's Respective Briefs All but Ignore the Oregon Court of Appeals' Ruling in *City of Eugene v. Lee* .......................15

III. The Court Should Uphold Plantiffs' Constitutional Right to Be Heard .....17

IV. Neither Planned Parenthood Nor the Grower's Market Have the Right to Be Completely Free of Inconvenience, Annoyance, or Alarm ...................19

   A. The Balance of Interests Favors Plaintiffs' Right of Free Expression, Even Outside Planned Parenthood .............................................19

   B. Plaintiffs' Argument Concerning Decibels is Not a "Fallacy" ...............23

V. Even Though DPS Officers Have Not Arrested Any AAOR Members, Mere Threats of Criminal Penalties Are Enough to Chill Free Speech ........25

CONCLUSION ....................................................................................27

CERTIFICATE OF COMPLIANCE WITH BRIEF LENGTH REQUIREMENTS ................................................................................30

CERTIFICATE OF SERVICE .............................................................31

i

# TABLE OF AUTHORITIES

**Federal Cases**

<u>Supreme Court Cases</u>

*Americans for Prosperity v. Bonta*, Case No. 19-251 (July 1, 2021)......................11

*Bd. of Airport Commrs. v. Jews for Jesus*, 482 U.S. 569 (1987)............................21

*Cameron v. Johnson*, 390 U.S. 611 (1968) ........................................................20

*City of Houston v. Hill*, 482 U.S. 451 (1987) ....................................................7, 11

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971).............................................*passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................27

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................5, 6, 8, 9, 10

*Gregory v. City of Chicago*, 394 U.S. 111 (1969)..................................................17

*Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640 (1981) ......4, 17, 19

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................5

*Kovacs v. Cooper*, 336 U.S. 77 (1949)..............................................................8, 19

*McCullen v. Coakley*, 573 U.S. 464 (2014)...........................................................11

*Saia v. New York*, 334 U.S. 558 (1948)............................................................*passim*

*Smith v. Goguen*, 415 U.S. 566 (1974).......................................................5, 6, 8, 16

*Snyder v. Phelps*, 562 U.S. 443 (2011)..................................................................14

*United States v. Stevens*, 559 U.S. 460 (2010) .......................................................11

*Virginia v. Hicks*, 539 U.S. 113 (2003) .................................................................11

<u>Ninth Circuit Cases</u>

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) ....................15, 23, 26, 27

*De Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ...................28

*Gathright v. City of Portland*, 439 F.3d 573 (9th Cir. 2006),
    *cert. denied*, 549 U.S. 815 (2006).................................................................19, 28

*La Duke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985)..................................................27

Other Appellate Cases

*Costello v. Burlington*, 632 F.3d 41 (2d Cir. 2011)...............................................2, 12

*Pine v. City of West Palm Beach*, 762 F.3d 1162 (11th Cir. 2014)........................19

*United States v. Doe*, 968 F.2d 86 (D.C. Cir. 1992).................................................13

District Court Cases

*Edwards v. City of Santa Barbara*, 883 F. Supp. 1393 (C.D. Cal. 1995) ...20, 21, 22

*Hampsmire v. City of Santa Cruz*, 899 F. Supp. 2d 922 (N.D. Cal. 2013) ...9, 12, 13

*Sabelko v. City of Phoenix*, 846 F. Supp. 810 (D. Ariz. 1994)........................*passim*

*Versace v. Versace 19.69 Abbigliamento Sportivo SRL*,
    328 F. Supp. 3d 1007 (N.D. Cal. 2018)............................................................27

*Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*,
    460 F. Supp. 2d 1165 (C.D. Cal. 2006) ............................................................26

**State Cases**

Oregon Court of Appeals Cases

*City of Eugene v. Lee*, 177 Or. App. 492 (2001) ......................................... 3, 16, 17

*City of Portland v. Ayers*, 93 Or. App. 731 (1988),
    *rev. den.*, 308 Or. 79 (1989)......................................................................... 17, 23

*State v. Chakerian*, 135 Or. App. 368 (1995)............................................... 7, 10, 16

*State v. Marker*, 21 Or. App. 671 (1975)....................................................7, 8, 16, 17

MOTION FOR PRELIMINARY INJUNCTION

*State v. Pucket*, 291 Or. App. 771 (2018), *rev. den.*, 363 Or. 727 (2018).....2, 12, 13

*State v. Rich*, 218 Or. App. 642 (2008) ..................................................... 7, 8, 16, 17

Other State Cases

*In re Kay*, 464 P.2d 142 (Cal. 1970)....................................................................20, 29

*State v. Pilcher*, 242 N.W.2d 348 (Iowa 1976) .......................................................11

**Constitutional Provisions, Statutes, Rules, & Ordinances**

Federal

U.S. Const. amend. I (First Amendment) ..................................................................15

U.S. Const. amend. IV (Fourth Amendment)..................................................... 10, 11

Fed. R. Civ. P. 56(a) ...................................................................................................4

State

Or. Const. art. I, § 8 .................................................................................................15

ORS 161.615(2) ...........................................................................................................6

ORS 161.635(1)(b) .......................................................................................................6

ORS 166.025(1)(b) ...............................................................................................*passim*

Local Ordinances

Grants Pass Mun. Code § 5.12.110(A) ...........................................................1, 18, 20

Grants Pass Mun. Code § 5.12.110(B)(11) ....................................................1, 18, 20

Grants Pass Mun. Code § 5.12.124(C) .......................................................................6

Plaintiffs ABOLISH ABORTION OREGON *et al.* (collectively "Plaintiffs")
hereby reply to the response brief (the "Response Brief," or "Def.'s Br." when
cited) that Defendant CITY OF GRANTS PASS (the "City") filed in opposition to
Plaintiffs' Motion for Partial Summary Judgment (the Motion, or "MPSJ" when
cited) on June 18, 2021, and the amicus curiae brief (the "Amicus Brief," or
"Amicus Br." when cited") that Oregon Attorney General Ellen Rosenblum (the
"State") filed on the same date, as follows:

## SUMMARY OF THE ARGUMENT

The Court should grant Plaintiffs' Motion seeking declaratory and permanent
injunctive relief for the following reasons:

1.      Subsections (A) and (B)(11) (collectively the "Sound Ordinance" or
the "Ordinance") of the Grants Pass Municipal Code ("Mun. Code" when cited] and
ORS 166.025(1)(b) are vague and overbroad because they lack the specificity
required of laws that abut First Amendment freedoms.  The Sound Ordinance and
ORS 166.025(1)(b) carry criminal penalties for those who violate them.  The
Constitution thus requires that the Sound Ordinance and ORS 166.025(1)(b) contain
a high degree of specificity – something both laws lack: Noise generated at a given
time and place is "loud," "unnecessary," "annoying," or "alarming" under the
Sound Ordinance, or "unreasonable" under ORS 166.025(1)(b), if a police officer
says it is.  This means officers must necessarily determine whether sound's volume
is excessive on an *ad hoc* and subjective basis, with the attendant dangers of
arbitrary and discriminatory application. This, the Constitution does not allow.

2.      The City's argument that the Constitution's use of the word
"unreasonable" in the Fourth Amendment means it should be easily understandable
for purposes of ORS 166.025(1)(b) is misplaced: The word "unreasonable," as used
in the Fourth Amendment, restrains police officers from infringing on average

1

citizens' constitutional rights. By contrast, in ORS 166.025(1)(b), the word "unreasonable" restrains average citizens and can accordingly be used by police officers to infringe on citizens' constitutional rights – freedom of speech in particular. The potential for a speaker to run afoul of the law by crossing an invisible line of reasonableness that can be drawn anywhere a police officer tasked with enforcing the law sees fit is precisely why ORS 166.025(1)(b) is overbroad – and why the Court should enjoin its enforcement.

3.     The City's reliance on *Costello v. City of Burlington*, 632 F.3d 41 (2d Cir. 2011), and *State v. Pucket*, 291 Or. App. 771 (2018), *rev denied*, 363 Or. 727 (2018), is also misplaced. At least one court in the Ninth Circuit has deemed *Costello* unpersuasive, holding that whether speech is too loud cannot be judged based on sheer volume alone, or even from how far away it can be heard; reasonableness must be determined in light of the activities and noise level that are customary in a given area. As for *Pucket*, even if the volume of certain Plaintiffs' speech has been excessive at times – a point Plaintiffs do not concede – Plaintiffs have been consistently unable to conform their conduct to ORS 166.025(1)(b)'s requirements to the satisfaction of the City's Department of Public Safety ("DPS"). This is because ORS 166.025(1)(b) contains no explicit standard concerning what is excessive, which is what makes the statute unconstitutionally vague and overbroad.

4.     There exists in this case a substantial risk of discriminatory application of both the Sound Ordinance and ORS 166.025(1)(b). DPS officers' consistent failure to apply to the musicians who play secular music at Grants Pass' Saturday Growers' Market (the "Growers' Market") the same standard of reasonableness they apply to Plaintiffs, even when the musicians are playing their music at the same volume at which Plaintiffs are preaching and even in the absence of complaints, amounts to a policy based on selective enforcement.

2

5.      In their arguments concerning ORS 166.025(1)(b), both the City and the State overwhelmingly gloss over *City of Eugene v. Lee*, 177 Or. App. 492 (2001) (hereinafter *Lee*), a case involving a local ordinance virtually identical to ORS 166.025(1)(b).  This is telling, because *Lee* supports the idea that to avoid being vague or overbroad, disorderly conduct laws should be buttressed by related provisions concerning the reasonableness of sound's volume, timing, and duration in given locations.  This would better allow speakers to conform their conduct to the standards of the law and reduce the prospect of officers using any of those factors as a pretext to silence unpopular speech based on its content.

6.      Citizens' right of free speech carries with it the right to be heard. Government's ability to control the volume of speech enables government to control the size of a speaker's audience.  In balancing the interests of both Plaintiffs and the City, the Court must keep Plaintiffs' right of free speech in a preferred position.  The City, via its opposition brief, is asking the Court to do the opposite.

7.      Plaintiffs' argument concerning decibels is not a "fallacy," as the City puts it.  Def.'s Br. at 26.  Decibels are the measurement the Supreme Court specifically prescribes for measuring whether sound is too loud – and, accordingly, ensuring that a law purporting to regulate sound based on volume is narrowly tailored.  *See Saia v. New York*, 334 U.S. 558, 562 (1948).  Even if distance from the source of a sound is an acceptable measurement of whether a sound's volume is excessive – a point that Plaintiffs do not concede – the City's argument that "the only way to enforce a noise law is based upon the testimony" of persons adversely affected [Def.'s Br. at 31] is a feeble attempt to justify what free-speech jurisprudence overwhelmingly makes clear is unjustifiable.

8.      The City's assertions to the contrary notwithstanding, neither Planned Parenthood and the clients it serves, nor the vendors and attendees at the Growers'

Market, have the right to be completely free of "inconvenience, annoyance, or alarm": "The First Amendment protects the right of every citizen to reach the minds of willing listeners *and to do so there must be the opportunity to win their attention*." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 655 (1981) (emphasis added) (internal quotation marks omitted).  While certain individuals may, at times, wish they did not have to put up with others' exercise of their free speech rights, the price of fostering debate on matters of public concern is that unwilling listeners typically bear the burden of shutting out undesirable sound.

  9. The fact that DPS officers have neither cited nor arrested any member of Abolish Abortion Oregon ("AAOR") does not mean the Court should deny injunctive relief: The mere threat of penalty is enough to chill the exercise of free speech by persons of ordinary firmness.  This meets the standard of irreparable harm required to restrain police misconduct via a preliminary injunction.

## ARGUMENT

  First and foremost, Fed. R. Civ. P. 56(a) requires that for the Court to be able to grant Plaintiffs' Motion, there must be "no genuine dispute as to any material fact."  The City's Response Brief does not dispute any of the material facts raised in Plaintiffs' MPSJ.  This case turns on the following material facts raised in Plaintiffs' Motion more than any other:

   (1) "AAOR consistently, if not exclusively, chooses traditional public forums – i.e., streets, sidewalks, and parks – as the locations where it exercises its free speech rights" [MPSJ at 6];

   (2) No matter what Plaintiffs do – whether using electronic sound-amplifying devices ("amplifiers"), non-electronic sound amplifying devices, or just their regular voices – the City's Department of Public Safety ("DPS") repeatedly hassles them for creating "unreasonable noise" [MPSJ at 7-8];

(3) The City does not hassle other speakers, most notably the musicians who
perform outside the Growers' Market, no matter how loudly the musicians
play, presumably because they draw fewer, if any, complaints –
something the three DPS officers initially named as Defendants in this
case have admitted [MPSJ at 8-9]; and

(4) The aforementioned officers "have admitted that the Sound Ordinance
provides no guidance as to what constitutes 'loud' or 'unnecessary' noise
or what makes noise 'disturbing' or 'alarming' – a DPS officer must make
the call as to whether the noise generated meets the standard under the
circumstances" [MPSJ at 9].  The State has also admitted that ORS
166.025(1)(b) leaves the determination of whether noise is unreasonable
to the discretion of individual officers.  Amicus Br. at 5.

With the foregoing in mind, Plaintiffs ask the Court to award Plaintiffs
summary judgment with regard to their requests for declaratory and injunctive relief
based on the following responses to the City's and the State's respective briefs:

I.  **The Sound Ordinance and ORS 166.025(1)(b) Are Both Unconstitutionally
Vague and Overbroad Because Neither Has the Specificity Required of
Criminal Statutes That Abut First Amendment Freedoms.**

"Where a statute's literal scope, ***underlined by a narrowing state court
interpretation***, is capable of reaching expression sheltered by the First Amendment,
the [vagueness] doctrine ***demands a greater degree of specificity*** than in other
contexts."  *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (emphasis added).  This is
especially true of laws enforceable by criminal penalties.  *Kolender v. Lawson*, 461
U.S. 352, 358 fn. 8 (1983).  This is also true of laws that "abut[] upon sensitive
areas of basic First Amendment freedoms," because such laws "operate[] to inhibit
the exercise of those freedoms."  *Grayned v. City of Rockford*, 408 U.S. 104, 109

(1972) (internal quotation marks omitted).  Indeed, because speakers' liberty is at stake in the most literal possible sense, "basic policy matters" – such as how loud is too loud – cannot be left to the discretion of "***policemen***, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id.* at 108-09 (emphasis added).

In this case, both the Sound Ordinance, which prohibits "loud, disturbing, and unnecessary" noise, and ORS 166.025(1)(b), which prohibits "mak[ing] unreasonable noise," carry criminal penalties for those who violate them: The Sound Ordinance carries with it no specific penalty, giving a court of competent jurisdiction wide discretion to impose a penalty as severe as it sees fit.  Mun. Code § 5.12.124(C).  Violations of ORS 166.025(1)(b), meanwhile, are punishable by fines of up to $2,500 and/or up to six months in prison.  *See* ORS 161.615(2) [concerning sentencing] and 161.635(1)(b) [concerning fines].  The Sound Ordinance and ORS 166.025(1)(b) also abut Plaintiffs' First Amendment freedom of speech, as exercised in accordance with their freedom of religion: But for Plaintiffs' good-faith efforts to reach the widest possible audience – whether with amplifiers or without – in accordance with their "right to be heard," a corollary of their freedom of speech [*see Saia*, 334 U.S. at 560-61], DPS would threaten enforcement of neither the Sound Ordinance nor ORS 166.025(1)(b) against them.

Because the Sound Ordinance and ORS 166.025(1)(b) abut the First Amendment freedom of speech and carry criminal penalties for violators, both laws demand a high degree of specificity.  *Smith*, 415 U.S. at 573.  Specificity is something both laws lack: The Sound Ordinance does not define what makes noise "loud," "unnecessary," "disturbing," or "alarming" enough to be punishable.  Artoff Dep. 14:16-15:14, 15:21-18:9; Hamilton Dep. at 24:12-21, 26:6-19, 28:12-20; McGinnis Dep. 14:1-22, 15:25-16:3.  As the City admits, whether noise is

punishable depends upon whether someone is complaining about the noise, which may or may not be objectively loud. Def.'s Br. at 30. Ordinances that render speech's lawfulness dependent upon others' subjective reactions are unconstitutional. *Coates v. City of Cincinnati*, 402 U.S. 611, 611-14 (1971).

As for ORS 166.025(1)(b), that statute declares "mak[ing] unreasonable noise" a punishable act. "Although a statute challenged for vagueness may sometimes be saved by a judicial interpretation that gives it required definiteness,' the ***statute itself must speak its meaning to the ordinary person***." *State v. Chakerian*, 135 Or. App. 368, 378 (1995) (emphasis added).[1] ORS 166.025(1)(b) does no such thing – the Oregon Court of Appeals' holdings in *State v. Marker*, 21 Or. App. 671, and *State v. Rich*, 218 Or. App. 642, notwithstanding. *See* Def.'s Br. at 13-15 [quoting *Marker* and *Rich* at length].

### A. The State is Incorrect in Asserting That ORS 166.025(1)(b) Need Not Define "Unreasonable."

"Although we [the Supreme Court] appreciate the difficulties of drafting precise laws, we have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy and offend them" – or others, for that matter. *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (hereinafter *Hill*). Making "unreasonable noise," for purposes of ORS 166.025(1)(b), constitutes conduct.

The State asserts in its Amicus Brief that "the statute does not need to define 'unreasonable' (which has a well understood plain meaning) or set forth specific parameters for it to be sufficiently clear what it prohibits." Amicus Br. at 4. The Court of Appeals said the same thing in *Marker*: "The word 'unreasonable' is commonly used in the law, and is commonly defined as: not conformable to reason,

---

[1] The Court should note that neither the City nor the State addresses *Chakerian* in their respective briefs.

MOTION FOR PRELIMINARY INJUNCTION

irrational, not governed or influenced by reason, immoderate, excessive …" 21 Or. App. at 675-76. However, the Supreme Court – whose opinions bear far greater weight than the Court of Appeals' – has declared otherwise: ORS 166.025(1)(b)'s "literal scope, ***unaided** by a narrowing state court interpretation*, is capable of reaching expression[.]" *Smith*, 415 U.S. at 573 (emphasis added). *Marker* acknowledges that ORS 166.025(1)(b) can reach expression. *Marker*, 21 Or. App. at 679; *see also* Amicus Br. at 6 [noting that the court in *Marker* "construed the word 'noise' to encompass loud communications that carry a clear and present danger of violence or merely a guise to disturb persons"]. Even so, the average speaker cannot determine, without looking to the narrowing state construction set forth in *Rich*, that the word "noise" only refers to speech's "noncommunicative" elements, such as volume, duration, or timing, and not its content. *Rich*, 218 Or. App. at 647. A speaker likewise cannot determine, based on the word "unreasonable" alone, what limits the noncommunicative elements of speech cannot exceed, as ORS 166.025(1)(b) prescribes no such limits.

Furthermore, given the Supreme Court's astute observation that "[a]nnoyance at ideas ***can be cloaked in annoyance at sound***" [*Saia*, 334 U.S. at 562 (emphasis added)], DPS officers can easily declare the volume and duration of speech unreasonable as a pretext to silence speech. A DPS officer tasked with enforcing ORS 166.025(1)(b) thus "stands athwart the channels of communication as an obstruction that can be removed only after criminal trial and conviction and lengthy appeal." *Kovacs v. Cooper*, 336 U.S. 77, 82 (1949) [quoting *Saia*, 334 U.S. at 560-61]. This is constitutionally problematic: "If arbitrary and discriminatory enforcement is to be prevented, ***laws must provide* _explicit_ *standards for those who apply them***." *Grayned*, 408 U.S. at 109 (emphasis added). There is nothing explicit about the word "unreasonable" in ORS 166.025(1)(b): As more than one

court has recognized, the reasonableness of a speaker's speech cannot be judged based on sheer volume and duration alone, nor even from how far away it can be heard.  *See*, e.g., *Hampsmire v. City of Santa Cruz*, 899 F. Supp. 2d 922, 933 (N.D. Cal. 2013) (citations omitted).  The reasonableness of the volume and duration of speaker's speech must be viewed in light of the activities and noise level that are customary in a given area.  *Id.*  Reading ORS 166.025(1)(b) standing alone, Plaintiffs must make educated guesses as to whether the volume of the sound they produce in a given location is reasonable and hope they guess right lest a DPS officer threaten to arrest them.  Since Plaintiffs must necessarily guess at what limits they cannot exceed – and risk being jailed or fined if DPS officers deem them incorrect, as DPS officers have done consistently – ORS 166.025(1)(b) is unconstitutionally vague.  *Coates*, 402 U.S. at 614.

The State asserts that "ORS 166.025(1)(b) allows officers to use discretion regarding whether a speaker is making noise that is 'unreasonable' in volume, duration, etc., not whether they agree with a speaker's viewpoint.  Therefore, it does not give officers 'unfettered discretion.'"  Amicus Br. at 5 [citing MPSJ at 19].  However, the State cites **_no_** language in ORS 166.025(1)(b) that fetters DPS officers' discretion as to volume, duration, and other noncommunicative elements of speech, because no such language is there.  This means police officers must necessarily determine a basic policy matter – i.e., how loud is too loud at a given time and place – on an *ad hoc* and subjective basis.  *Grayned*, 408 U.S. at 108-09.

ORS 166.025(1)(b) thus lacks the precision necessary to survive constitutional scrutiny.  Because DPS officers have consistently made such *ad hoc* and subjective determinations with regard to Plaintiffs and done so in an arbitrary and discriminatory manner [MPSJ at 27], the Court should declare ORS 166.025(1)(b) unconstitutionally vague, both on its face and as applied to Plaintiffs.

MOTION FOR PRELIMINARY INJUNCTION

**B. The City's Argument Concerning the Fourth Amendment's Use of the Word "Unreasonable" is Misplaced.**

The City argues that because "the founders of the Constitution had no problem in using the word 'unreasonable' in the Fourth Amendment to the United States Constitution to protect the rights of individuals from an improper search and seizure of them and their homes," the Court should find the word "unreasonable" to be sufficiently definite for purposes of ORS 166.025(1)(b).  Def.'s Br. at 12.

Never mind that, as the City acknowledges [Def.'s Br. at 12], there is an vast, ever-evolving, and ever-expanding body of jurisprudence concerning the meaning of "unreasonable" in the Fourth Amendment: The Fourth Amendment restrains police officers from infringing on average citizens' constitutional rights. By contrast, ORS 166.025(1)(b) restrains average citizens – and can accordingly be used by police officers to infringe on citizens' constitutional rights, the First Amendment freedom of speech in particular.

Furthermore, DPS officers receive extensive training to avoid running afoul of the Fourth Amendment and thereby violating citizens' constitutional rights. Hamilton Dep. 7:1-22, 13:16-14:7; Artoff Dep. 6:4-22, 9:13-19; McGinnis Dep. 6:8-14, 9:12-18.  By contrast, as stated *supra*, ORS 166.025(1)(b) requires average citizens – who presumably have little to no access to state court interpretations narrowly construing the statute, likely would not even know where to look for such interpretations, and must be able to glean the statute's meaning without looking to extrinsic sources anyway [*see Chakerian*, 135 Or. App. at 378] – to guess at what constitutes "unreasonable noise" at a given time and location.  Given the penalties it carries for those who guess wrong, ORS 166.025(1)(b) tends to chill a substantial amount of free speech because "uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone … ***than if the boundaries of the forbidden areas were <u>clearly</u> <u>marked</u>***."  *Grayned*, 408 U.S. at 109 (emphasis added).  Even

assuming *arguendo* that ORS 166.025(1)(b) has a plainly legitimate sweep, the potential for a speaker to run afoul of the law by crossing an invisible line of reasonableness that can be drawn anywhere a police officer tasked with enforcing the law sees fit is precisely why ORS 166.025(1)(b) is not only vague, but overbroad – and also why it is necessary to enjoin enforcement of that statute "until and unless" the State enacts statutory guidelines "to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003) (internal quotation marks omitted); *see also State v. Pilcher*, 242 N.W.2d 348, 354 (Iowa 1976) [noting that when a vague statute "may 'chill' the valid exercise of constitutional rights . . . the vagueness of the statute gives rise to its overbreadth; the concepts, in this situation, would merge"].

On a related note, the Supreme Court reiterated just yesterday that "[i]n the First Amendment context . . . 'a law may be invalidated as overbroad if a "substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep.'" *Americans for Propserity Foundation v. Bonta*, Case No. 19-251 at 1, 15-16 (July 1, 2021) [quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)]. Indeed, "[t]he prime effective of the First Amendment is not efficiency." *Id.* at 15 [quoting *McCullen v. Coakley*, 573 U.S. 464, 495 (2014)]. In other words, "[i]t would be dangerous," especially to speakers exercising their free speech rights and making good-faith efforts to comply with the law, "if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say" whose constitutional rights have been stepped on. *Hill*, 482 U.S. at 467.

The City's argument concerning the word "unreasonable" in the Fourth Amendment and the Oregon Legislature's use of the same word in ORS

166.025(1)(b) is thus not an "apples to apples" comparison.  The Court should therefore treat it as unpersuasive.

### C. The City's Reliance on *Costello v. City of Burlington* and *State v. Pucket* is Also Misplaced.

Even assuming the timing, volume, and/or duration of noise in a given place may be objectively unreasonable, in other cases, it is not as clear.  For this reason, one district court in the Ninth Circuit has found *Costello v. City of Burlington*, 632 F.3d 41, 46-47 (2d Cir. 2011) – a case the City heavily relies on in support of its meritless assertion that the case law does not support Plaintiffs' position [*see* Def.'s Br. at 9-10] – unpersuasive: In *Hampsmire*, 899 F. Supp. 2d 922, a street preacher was arrested for preaching too loudly in a city's business district.  Like Plaintiffs in this case, the street preacher drew complaints to the police from an individual who complained that the volume of the preacher's speech adversely affected his ability to do business.  *Id.* at 927-28.  At the time and location where the street preacher was arrested, "the downtown corridor was filled with the sounds of traffic, music, clapping, and the voices of other people on the street."  *Id.* at 933.  Plaintiffs must deal with many of the same issues at the Growers' Market and other locations where they preach; using amplification helps Plaintiffs knife through the noise to be heard.  *See* Goodknight Decl., ¶ 10.b, and Mayberry Decl., ¶ 7.a.

As stated *supra*, the court in *Hampsmire* held that whether speech is too loud cannot be judged based on sheer volume alone, or even from how far away it can be heard.  *Hampsmire*, 899 F.3d at 933.  Reasonableness must be determined in light of the activities and noise level that are customary in a given area, and laws regulating reasonableness should reflect this.  *Id.*  Indeed, one federal court found it "unreasonable to restrict noise exceeding 60 decibels at 50 feet in a park 'exposed to every form of urban commotion – passing traffic, bustling tourists, blaring radios,

*performing street musicians*, visiting schoolchildren.'" *Id.* (emphasis added) [quoting *United States v. Doe*, 968 F.2d 86, 91 (D.C. Cir. 1992)]. Given the competing ambient noise Plaintiffs must deal with when preaching at the Growers' Market, the volume of Plaintiffs' speech is not unreasonable, complaints to the contrary notwithstanding. *See* Goodknight Decl., ¶ 10.b, and Mayberry Decl., ¶ 7.a.

As the City notes in its discussion of *State v. Pucket*, 291 Or. App. 771 (2018), *rev denied*, 363 Or. 727 (2018), that case also involved a preacher who could be heard inside buildings or from great distances away. Def.'s Br. at 20. The City singles out Plaintiff Shawn Kellim ("Kellim"), the volume of whose speech the City has consistently deemed excessive, as a prime example of why the Court should not enjoin the City from enforcing ORS 166.025(1)(b) against Plaintiffs. *Id.* at 20-23. Even if the volume of Kellim's speech has been excessive at times – a point Plaintiffs do not concede – neither Kellim nor any other Plaintiff has been able to conform his or her conduct to ORS 166.025(1)(b)'s requirements to DPS officers' satisfaction. This is because ORS 166.025(1)(b) contains no explicit standard for Plaintiffs to conform their conduct to, which is what makes the statute unconstitutionally vague. *Coates*, 402 U.S. at 614. If half a city block is unreasonable, as the City asserts [Def.'s Br. at 19, 27], then Plaintiffs need legal guidelines as to what is reasonable so they can comply with the law and DPS can leave them alone to preach their message accordingly. Because ORS 166.025(1)(b) lacks such specificity, the Court should declare the statute unconstitutionally vague.

### D. There Exists a Substantial Risk That DPS Officers May Use "Unreasonable Noise" or "Disorderly Conduct" as a Pretext to Shut Down AAOR's Constitutionally Protected Speech.

"Where the criminalization of protected First Amendment expression turns on ***unfettered discretion***, there is a ***substantial risk that the discretion can be used in the suppression of ideas*** and is therefore unconstitutional." *Sabelko v. City of*

*Phoenix*, 846 F. Supp. 810, 821 (D. Ariz. 1994) (emphasis added).  Heightening this risk with regard to enforcing the Sound Ordinance and ORS 166.025(1)(b) is that some speakers may intend to cause "annoyance" or "alarm" to stir people to action on a matter of public concern.  *Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011). Speech on matters of public concern – that is, any matter of political, social, moral, or other concern to the community, including abortion – "occupies the 'highest rung of the hierarchy of First Amendment values,' ***and is entitled to special protection***.'" *Id.* at 452-53 (emphasis added) (internal quotation marks omitted).

In this case, Plaintiffs are speaking out on matters of public concern – namely, the evil that is abortion and the gospel of Jesus Christ.  MPSJ at 6; *see also Snyder*, 562 U.S. at 454 [recognizing matters related to politics and morality as matters of public concern].  Given Plaintiffs' staunch belief that abortion is murder, it stands to reason that Plaintiffs, to some degree, want citizens of Grants Pass to be "alarmed" that abortions are happening in their community, and thereby moved to take a stand against the slaughter of the unborn.  If Plaintiffs preach their message loudly, using amplification or otherwise, it is only because, like anyone whose conscience compels him to speak, Plaintiffs hope to reach as wide an audience – and thereby stir as many people to action – as possible.  Goodknight Decl., ¶ 9.

Since, as stated *supra*, those who dislike a speaker's message can, and often do, use annoyance at sound to mask annoyance at a message's content [*Saia*, 334 U.S. at 562], it stands to reason that a DPS officer could easily enforce a disorderly conduct statute on the basis of content and use volume as a reason to justify his actions.  The City cannot curb what it deems antisocial conduct through "enforcement of an ordinance whose violation depends entirely upon whether a policeman is annoyed."  *Coates*, 402 U.S. at 614.

The risk of discriminatory application of both the Sound Ordinance and ORS 166.025(1)(b) is great here: For instance, none of the DPS officers who submitted declarations in support of the City's brief opposing Plaintiffs' motion for a preliminary injunction – and which the City incorporated by reference in its Response Brief [*see* Def.'s Br. at 6] – denied that DPS officers tend to leave the musicians who play secular music at the Growers' Market alone, regardless of how loudly the musicians are playing.  This is essentially an admission that DPS officers are indeed enforcing an unconstitutional "heckler's veto." *Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019).

The City asserts that "it has always been the policy, practice, and custom" of DPS never "to enforce laws in a manner that deprives a person of the rights afforded to that person by the First Amendment to the Constitution of the United States."  Def.'s Br. at 30 [citing Decl. of Jim Hamilton in Opposition to Mot. for Prelim. Inj. (August 31, 2020)].  However, actions speak louder than words: The fact that DPS officers consistently leave the musicians at the Growers' Market alone regardless of how loudly they play and without regard for complaints shows that the City does, in fact, have a practice and/or custom, if not a policy, of singling out certain speakers – including and especially Plaintiffs – for discriminatory treatment.  The fact that Plaintiffs can identify at least 17 different DPS officers who have hassled them about the sound they have generated is evidence of this. *See*, e.g., Goodknight Decl., ¶ 10.b-h; Clark Decl., ¶ 7; and Kellim Decl., ¶ 10.

It is anathema to both the U.S. and Oregon constitutions to expect Plaintiffs to stop exercising their free speech rights out of fear that a DPS officer will charge them with disorderly conduct.  U.S. Const. amend. I; Or. Const. art. I, § 8.  The Court should thus declare the Sound Ordinance and ORS 166.025(1)(b) unconstitutionally vague.

## II.  **Both the City's and the State's Respective Briefs All But Ignore the Oregon Court of Appeals' Ruling in** *City of Eugene v. Lee*.

In their arguments concerning ORS 166.025(1)(b), both the City and the State overwhelmingly gloss over *Lee*, 177 Or. App. 492 – a case that, as Oregon's Court of Appeals has recognized, involved a local ordinance virtually identical to ORS 166.025(1)(b).  *See Rich*, 218 Or. App. at 647 [citing *Lee*].  The City only mentions *Lee* once, in its extensive excerpts from *Rich*. Def.'s Br. at 14.  The State, meanwhile, barely touches upon Lee, noting that Plaintiffs cited it and highlighting the Court of Appeals' nod to *Marker*. Amicus Br. at 4-5.

The Court of Appeals declared in *Lee* that if the term "noise," as used in the ordinance mirroring ORS 166.025(1)(b), includes expression, the court must then scrutinize the term "unreasonable" – which, like ORS 166.025(1)(b), the ordinance at issue in *Lee* did not define.  *Lee*, 177 Or. App. at 501.  As stated *supra*, the term "noise," as used in ORS 166.025(1)(b), can reach expression, including and especially communications that a police officer can deem "merely a guise to disturb persons."  *Marker*, 21 Or. App. at 679.

As also stated s*upra*, "a term that has no meaning to the ordinary person *without reference to the legislative history* <u>*cannot*</u> *withstand a vagueness challenge*."  *Chakerian*, 135 Or. App. at 378.  The same goes for statutes whose meanings cannot be ascertained without reference to limiting state court constructions.  *Smith*, 415 U.S. at 573.  *Lee* stands for the proposition that to avoid being vague or overbroad, disorderly conduct laws must be buttressed by related provisions concerning the volume, timing, duration, and location of sound, which would give both speakers and police officers – not to mention judges and juries – much-needed guidance in determining whether noise is unreasonable.  Without such guidance, speakers will find it difficult to conform their conduct to the standards of

the law, and police officers tasked with enforcing the law would have far too much power to use any of those factors as a pretext to silence unpopular speech based on its content – just as DPS officers have used ORS 166.025(1)(b) against Plaintiffs. The Court should thus treat *Lee* as more persuasive than *Marker* or *Rich*.

### III.  **The Court Should Uphold Plaintiffs' Constitutional Right to Be Heard.**

For the right of free speech to be meaningful, a speaker must have the opportunity to reach, and ultimately win over, his or her target audience. *Heffron*, 452 U.S. at 655.  "However reasonable the police request may [be] and however laudable the police motives," the police cannot, within constitutional bounds, threaten or punish speakers for simply trying to be heard. *Gregory v. City of Chicago*, 394 U.S. 111, 112 (1969).

In this case, the City cites *City of Portland v. Ayers*, 93 Or. App. 731 (1988), *rev. den.*, 308 Or. 79 (1989) in support of its position. Def.'s Br. at 13. As the dissent in *Ayers* observed, however, by controlling speech's volume – or the range of distance which sound cannot exceed – a city can "control the size and proximity of [a] speaker's audience." *Ayers*, 93 Or. App. at 749 (Newman, J., dissenting).

Contrary to the City's Response Brief, Plaintiffs do not contend, and never have, that their freedom to preach their pro-gospel, anti-abortion message entitles them to "sound-blast" doctors and patients out of lobby and examination rooms in offices 50 feet away. Defs.' Br. at 8. Plaintiffs do contend what the dissent in *Ayer* observed: "Amplification devices … ordinarily are indispensable if a speaker is to communicate effectively on a public street to a substantial audience." *Ayers*, 93 Or. App. at 749 (Newman, J., dissenting). Effective communication is Plaintiffs' goal: Its members use sound-amplifying devices precisely so they "can speak in normal, civil tones while still being heard by a fairly wide audience." *See* Decls. of Mason Goodknight [¶ 9], Ryan Clark [¶ 6], Shawn Kellim [¶ 6], and Mark Mayberry [¶ 6].

The City exaggerates in asserting that Plaintiffs contend they have the right broadcast their speech to someone in a building 300 feet away.  Def.'s Br. at 8. First, even assuming 300 feet is not reasonable in the City's estimation, neither the Sound Ordinance nor ORS 166.025(1)(b) prescribes what is.  *See* Mun. Code § 5.12.110(A), (B)(11).  Second, even assuming Plaintiffs can be heard from roughly half that distance, as one DPS officer has asserted, the City has not made clear why 150 feet is objectively unreasonable, whether in the vicinity of the Growers' Market or at Planned Parenthood.  Decl. of Timothy Artoff in Opposition to Pls.' Mot. for Prelim. Inj., ¶ 7 (August 31, 2020) [asserting that he "could clearly hear the noise of the amplifier from well over 150 feet away" as he approached Planned Parenthood].

What Plaintiffs have sought all along is a measurable standard they can comply with so the City will ultimately leave them alone based on their compliance. Plaintiffs have asked the Court "to order the City to amend the Sound Ordinance to prescribe decibel levels that speakers using amplification cannot exceed when heard from a specific distance from the source of the sound at specific locations at specific times of the day" for precisely that reason.  MPSJ at 35.  The City's position seems to be that if Plaintiffs make themselves heard at any volume above a whisper, Plaintiffs are acting unlawfully.  Def.'s Br. at 18.  Also, the City incorrectly asserts that "at no time, [sic] have the plaintiffs ever been prohibited from speaking about anything to anybody while they stood on the sidewalks next to NW Washington Boulevard with their natural voice at any volume" [*id.*] near Planned Parenthood: On January 2, 2020, Clark was speaking without amplification near Planned Parenthood when a DPS officer ordered him to stop – and he has provided the Court video to prove it.  *See* Clark Decl., 7.b, Ex. "A."

If an AAOR member cannot even preach in his or her natural voice without being told he or she is generating loud or unreasonable noise, it stands to reason that

engaging in non-verbal speech is their only option – something the City all but confirms.  Def.'s Br. at 18.  To protect Plaintiffs' right to be heard, then, the Court should grant Plaintiffs a permanent injunction.

## IV.  Neither Planned Parenthood Nor the Growers' Market Have the Right to Be Completely Free of Inconvenience, Annoyance, or Alarm.

As stated *supra*, "[t]he First Amendment protects the right of every citizen to 'reach the minds of willing listeners ***and to do so there must be the opportunity to win their attention***.'"  *Heffron*, 452 U.S. at 655 (emphasis added) [quoting *Kovacs*, 336 U.S. at 87].  That rule even, if not especially, applies near abortion clinics.  *See Sabelko*, 846 F. Supp. at 824-26.  Furthermore, where an individual engages in speech in a traditional public forum at the same time an event open to the general public is taking place in or near that forum, the city may not evict the individual from that forum on the grounds that the event's operator finds the individual's use of the forum disagreeable.  *Gathright v. City of Portland*, 439 F.3d 573, 575 (9th Cir. 2006), *cert. denied*, 549 U.S. 815 (2006).

### A. The Balance of Interests Favors Plaintiffs' Right of Free Expression, Even Outside Planned Parenthood.

Without mentioning it by name in its Response Brief, the City essentially asserts the "captive audience" doctrine as a defense to its actions toward Plaintiffs in the vicinity of Planned Parenthood and its neighboring medical offices.  Def.'s Br. at 10 [quoting *Pine v. City of West Palm Beach*, 762 F.3d 1162 (11th Cir. 2014)] and 21-23 [citing Decls. of Leah Swanson ("Swanson Decl."), Deana Carvalho, and Tori Rumrey in Opposition to Mot. for Prelim. Inj.].  Out of an abundance of caution, Plaintiffs respond as follows:

First and foremost, "[i]t is an inevitable byproduct of life in modern day society, especially in an urban setting, that we are often captives outside the

sanctuary of the home and [thus] subject to objectionable speech." *Sabelko*, 846 F.3d at 824 (internal quotation marks omitted).  Courts have thus typically applied the captive audience doctrine sparingly, and even less frequently in circumstances not involving homes.  *Edwards v. City of Santa Barbara*, 883 F. Supp. 1393 (C.D. Cal. 1995).  However, the doctrine "can be used outside the residential setting when the degree of captivity makes it impractical for the unwilling viewer or [listener] to avoid exposure."  *Sabelko*, 846 F.3d at 825 (internal quotation marks omitted).  Such a degree exists in healthcare facilities.[2]  *Edwards*, 883 F. Supp. at 1387.

That said, even if the City's interest in preserving peace and tranquility near healthcare facilities is substantial, the City's own authorities indicate that "time, place, and manner" regulations of speech, amplified or otherwise, must be precisely and narrowly drawn.  *See* Defs.' Br. at 13 [quoting *Cameron v. Johnson*, 390 U.S. 611, 615-16 (1968)].  "A law is narrowly tailored if it 'targets and eliminates ***no more than*** the source of the "evil" it seeks to remedy.'"  *Edwards*, 883 F. Supp. at 1388 (emphasis added) (internal quotation marks omitted).  Indeed, the fact that cities and states have leeway to impose "time, place, and manner" regulations does not mean they "can grant to the police a 'roving commission'" to silence the free exercise of religious opinions.  *In re Kay*, 464 P.2d 142, 147 (Cal. 1970).

Nothing about either the Sound Ordinance or ORS 166.025(1)(b) is narrowly and precisely drawn to eliminate excessive noise near healthcare facilities or anywhere else in Grants Pass.  *See* Mun. Code § 5.12.110(A), (B)(11).  Particularly troublesome is the Ordinance's prohibition of "disturbing" noise that "annoys, disturbs . . . or endangers the comfort, repose . . . or peace of others."  *Id.* at subsection (A).  Planned Parenthood's manager says Plaintiffs' speech makes her

---

[2] While Plaintiffs acknowledge that legislatures and courts frequently view and treat abortion clinics as healthcare facilities, Plaintiffs take issue with this characterization, as they believe abortion is not "healthcare," but murder.

MOTION FOR PRELIMINARY INJUNCTION

clinic's clients and employees – herself included – feel anxious, stressed, and disturbed.  Swanson Decl., ¶ 11.  That presumably has as much to do with the content of Plaintiffs' speech as its volume, though the volume is what gives Planned Parenthood an excuse to have DPS officers silence Plaintiffs.  *Saia*, 334 at 562.

Even if the flaws in the Sound Ordinance and ORS 166.025(1)(b) do not give Plaintiffs carte blanche to overwhelm the ears of unwilling listeners, those flaws still give the City's DPS officers far too much power to chill Plaintiffs' exercise of their free speech rights, as they have attempted to do with threats of citations and arrests – and, in two cases, actual citations.  This, the U.S. and Oregon constitutions cannot allow, because "the opportunity for abuse . . . is self-evident."  *Bd. of Airport Commrs. v. Jews for Jesus*, 482 U.S. 569, 576 (1987).  If the City wants to narrowly tailor its regulation of Plaintiffs' amplified speech near Planned Parenthood and its neighboring healthcare facilities, the City can prescribe a decibel level, measurable at a specified distance from the source of the sound that Plaintiffs generate, that Plaintiffs' speech cannot exceed.  *Saia*, 334 U.S. at 560.  DPS officers must then leave Plaintiffs alone if their speech does not exceed the prescribed volume.

Furthermore, the City is incorrect in asserting that "the basic premise of the Plaintiffs is false, and not supported any by case law."  Def.'s Br. at 9.  At least two district courts in the Ninth Circuit have held that cities must, to some degree, allow free speech, and perhaps even the use of sound-amplifying devices, within the vicinity of abortion clinics:

- In *Edwards*, cited *supra*, the court enjoined enforcement of an ordinance restricting free speech activities within 100 feet of an abortion clinic.  *Id.* at 1381-82.  The plaintiff, a "sidewalk counselor," complained that the ordinance "force[d] her to speak" to her intended audience "at a volume that prevents empathy and sometimes even causes stress."  *Id.* at 1182.

AAOR's preachers use sound-amplifying devices for a similar reason: to reach a wide audience in civil, normal tones.  *See* Decls. of Goodknight [¶ 9], Clark [¶ 6], Kellim [¶ 6], and Mark Mayberry [¶ 6].  The court in *Edwards*, 883 F. 3d at 1393, also held that the captive audience doctrine does not apply to persons traveling on sidewalks to and from abortion clinics.  Such persons include at least a portion of Plaintiffs' intended audience – and given that (1) Planned Parenthood is located on a private street and (2) DPS officers will likely cite Plaintiffs for trespassing should they enter Planned Parenthood's property, the only way Plaintiffs can reach their audience is from a distance.

- The court in *Edwards* relied heavily on *Sabelko*, cited *supra*, in granting a preliminary injunction.  *See*, e.g., *Edwards*, 883 F.3d at 1392 [citing *Sabelko*, 846 F. Supp. at 823].  In *Sabelko*, 846 F. Supp. at 825, the court held that where an ordinance regulating speech is constitutionally infirm – as the Sound Ordinance and ORS 166.025(1)(b) both are – the free speech rights "of those who may be the subject of criminal prosecution under the Ordinance ***must outweigh*** the rights of those who seek to be left alone, ***even if a captive audience situation were to apply***" (emphasis added).  That applies as much to oral speech, amplified or otherwise, as it does to quieter forms of speech, such as leafletting and holding signs.  *Id.* at 818, 821 [concerning regulations of volume that are narrow in scope versus broad restrictions on free speech activity near healthcare facilities].

- The courts in *Edwards* and *Sabelko* both enjoined enforcement of the ordinances at issue in their respective cases in large part because the ordinances were overbroad.  *Edwards*, 883 F.3d at 1388-93; *Sabelko*, 846

F. Supp. at 821.  The Sound Ordinance and ORS 166.025(1)(b) in this case suffer from the same defect.  MPSJ at 21-22.

In balancing Plaintiffs' and the City's competing interests, the Court "should be mindful to keep the freedoms of the First Amendment *in a __preferred__ position*." *Saia*, 334 U.S. at 562 (emphasis added). The City is asking the Court to do the opposite.  The Court should therefore permanently enjoin the City from enforcing either the Sound Ordinance or ORS 166.025(1)(b) against Plaintiffs.

**B. Plaintiffs' Argument Concerning Decibels is Not a "Fallacy."**

Decibels are the measurement the Supreme Court has specifically prescribed for measuring whether sound is too loud – and, accordingly, whether a law purporting to regulate sound based on volume is narrowly tailored.  *See Saia*, 334 U.S. at 562 ["Noise can be regulated by regulating decibels"].  Even if distance from the source of a sound, regardless of how loud the sound is so long as it is plainly audible, is an acceptable measurement of whether the sound's volume is excessive – a point Plaintiffs do not concede, the Oregon Court of Appeals' holding in *Ayers*, 93 Or. App. at 559, notwithstanding – neither the Sound Ordinance nor ORS 166.025(1)(b) prescribe such a distance.  The City's argument that "the only way to enforce a noise law is based upon the testimony" of persons adversely affected [Def.'s Br. at 31] is a feeble attempt to justify what is constitutionally unjustifiable: The mere fact that someone does not want to hear something, or deems it too loud for his or her liking, is not a valid measure of the reasonableness of speech's volume.  *Cuviello*, 944 F.3d at 834.

The City's argument that Plaintiffs "want a decibel standard to escape the enforcement of any noise laws against them" [Def.'s Br. at 31] could not be farther from the truth. On the contrary, Plaintiffs want a measurable standard to which they can conform their conduct and thereby avoid further hassles from DPS officers.

Right now, the City's standard is, "It's too loud when the Grants Pass police say so."  The Supreme Court has made clear that such a standard gives police officers far too much power to shut down lawful speech based on whether they, or the citizens they are tasked with protecting, are annoyed.  *Coates*, 402 U.S. at 611-14.

The City's argument concerning decibel meters is also unpersuasive: To enforce speed laws on streets and highways, police use radar guns to measure drivers' speed.  Asking DPS officers to use decibel meters to measure sound levels is no different.  Even if a speaker does turn off his amplifier when he sees the police coming, as the City asserts AAOR's members will likely do [Def.'s Br. at 27], that is no different than a speeding driver slowing down considerably when the driver sees a state trooper's patrol car parked on the side of the highway.  The radar gun allows the state trooper to detect from a distance that the driver is speeding and cite the driver for it if the driver does not, of his own accord, reduce his speed.  It would work the same way with decibel meters: DPS officers can use them to measure whether an AAOR member is consistently exceeding a prescribed decibel level at a prescribed distance over a prescribed duration and enforce the Sound Ordinance and/or ORS 166.025(1)(b) accordingly.  DPS officers can also use video from their body cams to record the readings on the decibel meters, thereby enabling the prosecutors tasked with convicting violators of the Sound Ordinance and/or ORS 166.025(1)(b) to prove their cases beyond a reasonable doubt.

The City's characterization of Plaintiffs' decibel argument as a "fallacy" is thus meritless.  Def.'s Br. at 26.  Furthermore, Plaintiffs are not asking the average citizens of Grants Pass to carry decibel meters around, as the City asserts – only DPS officers.  *Id*. at 28 ["No average citizen is going to carry a decibel meter around in his or her pocket, nor should they be required to do so"].  Because a measurement involving both decibels and distance from the source of sound would

MOTION FOR PRELIMINARY INJUNCTION

make reasonableness determinations under both the Sound Ordinance and ORS 166.025(1)(b) far less *ad hoc* and subjective, the Court should issue an injunction requiring the City to incorporate such measurements into its municipal code.

## V. **Even Though DPS Officers Have Not Arrested Any Plaintiffs, Mere Threats of Criminal Penalties Are Enough to Chill Free Speech.**

The City asserts that "the Sound Ordinance has never been enforced against" Plaintiffs [Def.'s Br. at 8] and that ORS 166.025(1)(b) "has only been raised against Plaintiff Shawn Kellim" [*id.* at 7, 18]. These assertions are misleading, inaccurate – if not outright false – and ultimately irrelevant.

Start with the City's assertion concerning ORS 166.025(1)(b): This assertion is misleading because, while it is true that Kellim is the only Plaintiff in this proceeding who has been charged with disorderly conduct, he was not charged under ORS 166.025(1)(b): Attached as Exhibit "F" to Kellim's declaration supporting Plaintiffs' MPSJ is a copy of the ticket that DPS Officer Timothy Artoff ("Officer Artoff") issued to Kellim on August 15, 2019. Midway down the ticket, under the heading "Offense(s)," is listed ORS 166.023(2)(a), which defines knowingly making or circulating a false report about a hazardous substance or an alleged or impending, fire, explosion, or other emergency as disorderly conduct in the first degree. Even if the City intended to charge Kellim under ORS 166.025(1)(b), the City not only compounds its error by asserting that Kellim was charged under ORS 166.025(1)(b) despite hard evidence to the contrary, it undermines its own credibility in the process.

On top of that, even granting that Kellim is the only Plaintiff whom the City has cited for disorderly conduct, the City has threatened to arrest several Plaintiffs for disorderly conduct: In the video provided to the Court as Exhibit "A" to Plaintiff Lori Mayberry's declaration, DPS Deputy Chief Jim Hamilton threatens to arrest

her for disorderly conduct if she does not cease using sound-amplifying equipment.
Plaintiffs Mason Goodknight ("Goodknight") and Ryan Clark ("Clark") have also
filed complaints against DPS officers who threatened to arrest them for disorderly
conduct.  *See* Goodknight Decl., Ex. "F," and Clark Decl., Exs. "D"-"E."
Goodknight, in fact, has been threatened more than once – and so has Kellim since
his arrest.  Goodknight Decl., Ex. "E"; Kellim Decl., Exs. "A" and "E."  Threats to
enforce a law themselves constitute enforcement, as the purpose of such threats is to
induce compliance with the law.  *See Vietnamese Buddhism Study Temple in Am. v.*
*City of Garden Grove*, 460 F. Supp. 2d 1165, 1176 (C.D. Cal. 2006) [enjoining a
city from "enforcing, by any means, ***including threats of enforcement***," certain
local ordinances (emphasis added)].  Applying this standard, it is inaccurate for the
City to assert that ORS 166.025(1)(b) has only been enforced against Kellim.

As for the Sound Ordinance, the City has repeatedly threatened to cite
Plaintiffs for violating it – that is what gave rise to this case.  Only after Plaintiffs
brought this suit challenging the constitutionality of the Sound Ordinance did the
City pledge to stop enforcing it until the Ordinance has been revised – and begin
enforcing ORS 166.025(1)(b) instead.  Decl. of Atty. Mark Bartholomew in
Opposition to Mot. for Prelim. Inj., ¶¶ 2-4 (Aug. 31, 2020).

Even if the Court defines "enforcement" to include only arrests and citations,
however, that is ultimately irrelevant: As the U.S. Court of Appeals for the Ninth
Circuit has recognized, the mere threat of criminal sanctions is enough to chill the
exercise of a plaintiff's free speech rights and thereby constitutes irreparable harm
favoring the issuance of an injunction.  *Cuviello*, 944 F.3d at 834.  Without
injunctive relief, the City's DPS officers can wield ORS 166.025(1)(b) like a billy
club, using it to silence Plaintiffs anytime a complaining citizen finds their speech
tiresome – as, in fact, the City's DPS officers already have.

The mere threat of criminal penalties is enough to have a chilling effect on the exercise of free speech. *Cuviello*, 944 F.3d at 833. Accordingly, to prevent Plaintiffs' free-speech rights from being "continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct" [*Coates*, 402 U.S. at 615-16], the Court should permanently enjoin the City from enforcing the Sound Ordinance and ORS 166.025(1)(b) against Plaintiffs.

## CONCLUSION

To obtain a permanent injunction, a plaintiff must demonstrate (1) irreparable injury, (2) inadequacy of money damages, (3) a balance of hardships meriting an equitable remedy; and (4) the public interest favors the grant of a permanent injunction. *Versace v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F. Supp. 3d 1007, 1032 (N.D. Cal. 2018). Here, Plaintiffs have demonstrated all four:

- **Irreparable injury:** "The loss of First Amendment freedoms, *for even minimal periods of time*, <u>unquestionably</u> constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Court has already found that "plaintiffs have demonstrated that they *were* harmed by DPS officers' reliance on the Sound Ordinance." Or. Denying Prelim. Inj. at 10 (emphasis in the original). At least four Plaintiffs have also been harmed by the City's threats to enforce ORS 166.025(1)(b) against them. Goodknight Decl., ¶ 10.f-h, Exs. "E"-"G"; Clark Decl., ¶ 7.e, Ex. "A"; Kellim Decl., ¶ 7, Ex. "A."; Lori M. Decl., ¶ 6.g, Ex. "A."

- **Inadequacy of money damages:** Though monetary damages may soothe the pain of past wrongs suffered, they are inadequate where such damages will not stop a defendant from continuing to infringe on a plaintiff's constitutional rights. *La Duke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir. 1985) [holding that the grant of an injunction is "sound" where "(t)he high likelihood that the

violations" of legal or constitutional rights "will recur absent issuance of an injunction counsels in favor of equitable rather than legal relief"].  Such a prospect exists here: The fact that Plaintiffs filed this lawsuit has not stopped DPS from attempting to chill Plaintiffs' exercise of their free-speech rights – rather, instead of enforcing the Sound Ordinance, DPS has threatened to enforce a criminal statute, ORS 166.025(1)(b), to shut Plaintiffs up.

- **Balance of harms:** The effect of denying a permanent injunction to Plaintiffs far outweighs any injury the City will suffer should the Court grant it: Even if merchants and attendees at venues where Plaintiffs preach find Plaintiffs' message disagreeable or complain that Plaintiffs' speech is too loud for their liking, "[t]he City cannot . . . claim that one's constitutionally protected rights disappear [where] a private party is hosting an event that remains free and open to the public." *Gathright*, 439 F.3d at 579.  The same applies with regard to Planned Parenthood:

- **Public interest:** "***It is <u>always</u> in the public interest*** to prevent the violation of a party's constitutional rights."  *De Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (emphasis added) (internal quotation marks omitted).  Because Plaintiffs' First Amendment-protected freedoms of speech and religion are at stake, an injunction would be in the public interest here.

Based on the foregoing, the Court should declare the Sound Ordinance and ORS 166.025(1)(b) unconstitutional, both on their face and as applied to Plaintiffs, and permanently enjoin the City from doing the following:

- Evicting, removing, or excluding Plaintiffs or anyone associating with AAOR from any street, sidewalk, park, and/or event that takes place within the City's jurisdiction while they are engaged in the lawful exercise of First Amendment-protected activities;

- Ordering Plaintiffs or anyone associating with AAOR who is using an amplifier when preaching to cease using said amplifier, or to lower its volume;

- Harassing, intimidating, threatening, or otherwise attempting to chill the exercise of the constitutionally protected free speech rights of Plaintiffs, or anyone associating with AAOR, while Plaintiffs and/or anyone associating with AAOR are engaged in such exercise; or

- Unreasonably restricting the time, place, and especially the manner of speech of Plaintiffs or anyone associating with AAOR, particularly when AAOR, its members, and/or anyone associating with them are using sound-amplifying equipment.  Toward this end, Plaintiffs ask the Court to order the City to amend the Sound Ordinance to prescribe decibel levels that speakers using amplification cannot exceed when heard at a specific distance from the source of the sound at specific locations at specific times of the day.

"The happy cacophony of democracy would be stilled if all 'improper noises'" – or "loud" or "unreasonable" noises, as the case may be – "in the normal meaning of the term were suppressed."  *Kay*, 464 P.2d at 148.  To keep the happy cacophony of democracy from being stilled, the Court should grant Plaintiffs' motion for partial summary judgment.

Dated:  July 2, 2021                          PACIFIC JUSTICE INSTITUTE

                                              */s/ RAY D. HACKE*
                                              _____
                                              Ray D. Hacke
                                              Oregon State Bar No. 173647
                                              Attorney for Plaintiffs
                                              ABOLISH ABORTION OREGON *et al.*

## CERTIFICATE OF COMPLIANCE WITH BRIEF LENGTH REQUIREMENTS

I hereby certify that (1) this brief complies with the word-count limitation set forth in Local Rule 7-2(b) and (2) that the word count of this brief is 8,874 words.

Dated:  July 2, 2021

PACIFIC JUSTICE INSTITUTE

*/s/ RAY D. HACKE*

Ray D. Hacke
OSB No. 173647
Attorney for Plaintiffs
ABOLISH ABORTION OREGON *et al.*

# CERTIFICATE OF SERVICE

STATE OF OREGON       )
)
) ss.
)
COUNTY OF MARION     )

I am employed in the County of Marion, State of Oregon. I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave. NE, Suite 33, Salem, OR 97305.

On July 2, 2021, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**PLAINTIFFS' REPLY TO RESPONSE OF DEFENDANT CITY OF GRANTS PASS TO MOTION FOR PARTIAL SUMMARY JUDGMENT, AND TO OREGON ATTORNEY GENERAL ELLEN ROSENBLUM'S AMICUS CURIAE BRIEF**

## PLEASE SEE ATTACHED SERVICE LIST

  X  BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

_____BY FACSIMILE TRANSMISSION:  The facsimile machine I used complied with California Rules of Court 2003(3) and no error was reported by the machine. Pursuant to rule 2005(i), I caused the machine to print a record of the transmission, a copy of which is attached to this proof of service.

_____BY FEDERAL EXPRESS:  I caused the above-referenced document(s) to be delivered via Federal Express, for delivery to the above address(es).

_____(State) I declare under penalty of perjury under the laws of the State of Oregon that the above is true and correct.

  X  (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 2, 2021, at Salem, Oregon.


                                 */s/ RAY D. HACKE*
                                 Ray D. Hacke

## <u>SERVICE LIST</u>

Robert E. Franz, Jr.
Attorney For Defendants
Law Office of Robert E. Franz, Jr.
P.O. Box 62
Springfield, OR 97477

Carla Scott and Abigail Fallon
Oregon Department of Justice
Special Litigation Unit – Trial Division
100 SW Market St.
Portland, OR 97201

MOTION FOR PRELIMINARY INJUNCTION